The NORTHERN TRUST COMPANY,
Plaintiff,

v.

The CHASE MANHATTAN BANK,
N.A., Defendant.

No. 82 Civ. 0215 (IBW).

United States District Court,
S.D. New York.

March 23, 1984.

Cravath, Swaine & Moore, New York City, for plaintiff; Michael Spencer, John Gleeson, New York City, of counsel.

Andrew S. O'Connor, New York City, for defendant; Laura Effel, Marianne Popiel, New York City, of counsel.

## OPINION

WYATT, District Judge.

This is the decision after a trial to the Court without a jury, no demand having been made for a jury.

The action was brought by The Northern Trust Company ("Northern"), an Illinois corporation with its principal place of business (banking) in Chicago. The defendant is The Chase Manhattan Bank, N.A. ("Chase"), a national banking association with its principal place of business (banking) in the City of New York. There is diversity jurisdiction under 28 U.S.C. § 1332, Chase being deemed a citizen of New York for the purpose of suits by or against it (28 U.S.C. § 1348). The parties are agreed that New York law is to be applied.

The action was brought by reason of a check which was forged by an unknown person and which has caused Northern to be presently out-of-pocket $473,272.22. Northern is here seeking to recover this amount from Chase.

There is little, if any, dispute as to the facts. A stipulation sets out the principal facts. The trial transcript is somewhat confused, but the stipulation appears to have been received in evidence as Exhibit 1 (Tr. 31; "Tr." references are to pages of the trial transcript; the stipulation itself will be referred to as "Stip.").

The contest here, consequent on the fraud with forgery, is to determine which of two innocent banks is to bear the loss caused by the fraud. The conclusion is that, on balance, judgment must be for Chase.

1.

At some time before October 20, 1979, an unknown person took without authority (stole) from the offices of Northern in Chicago a special form of check (referred to by the parties as an "official check form") and a sheet of Northern stationery. The check taken was in that form used by Northern when it wished as fiduciary to issue a check drawing on itself as, for example, in payment for securities bought by Northern for a trust account. A person unknown and unauthorized filled out the stolen official check form: the date was shown as "9–21–79"; the payee was shown as "Chase Bank International"; and the amount was shown as $473,272.22. The check form has a printed signature of Northern as drawer "As Fiduciary" with then a space for a manual signature for Northern over the words "Authorized Signature". An unknown person in this space forged the signature of Chester Dziewa, who was an employee of Northern authorized to sign checks of this type.

Chase has four "affiliated entities" (Stip., para 28) named "Chase Bank International (Chicago)", "Chase Bank International (Los Angeles)", "Chase Bank International (Mi-

ami)", and "Chase Bank International (Houston)", which are located only in the respective cities shown in their names. There is no separate entity known simply as "Chase Bank International".

A person unknown and unauthorized prepared a one-page letter on the stolen sheet of Northern stationery, and forged the signature to it of David W. Holman, a vice-president of Northern. This letter was dated October 11, 1979, was addressed to "Chase Manhattan Bank" in New York, and described itself as a "letter of direction". The letter requested that Chase "wire the enclosed funds in the amount of $473,272.22 to Mr. R.L. Fraise's account at the address listed below" and then listed an address, apparently that of the Amro Bank in Amsterdam ("Amro") (Stip., para 3).

Amro Bank had a correspondent account with Northern (Stip., para 50). Evidently Amro also had such an account with Chase. Northern also had such an account with Chase, but there is nothing in the record as to the state of the account at the relevant times.

On Saturday, October 20, 1979, the check and letter were received by Chase in New York; they had been "mailed to Chase Manhattan Bank in New York" (Stip., para 17).

On Monday, October 22, Chase credited the amount of the check to the account of Amro at Chase, advised Amro by "a telecommunications system" (presumably radio) that it had done so, and mailed to Amro a "statement copy of credit previously advised" (Stip., paras 21, 22, Ex. D). This is the manner in which Chase normally effects wire transfers to its correspondent banks (Stip., para 21). On the same day, October 22, Chase endorsed the check ("Chase Manhattan Bank") and forwarded it by air to Federal Reserve Bank of Chicago for presentment to Northern (Stip., para 24). Chase thus acted on the reasonable but mistaken belief that the forged check and letter were genuine; Chase carried out the presumed instructions of Northern contained in the forged letter.

On Tuesday, October 23, the check was presented to Northern in Chicago, presumably by the Federal Reserve Bank there, although the stipulation (para 37) states that "presentment" was made "by Chase". Although the check purported to be signed by Northern and drawn on it, Northern did not recognize that the check was forged, treated it as genuine and paid it. The stipulation does not detail the manner of payment but undoubtedly it was settled through the routine Federal Reserve Bank of Chicago clearing system. On the same date, October 23, the account of Chase at Federal Reserve Bank of New York was credited with the amount of the check on instructions of Federal Reserve Bank of Chicago.

On October 23, 1979, the account at Amro in the name of R.L. Fraise showed a credit balance of 24.45 Dutch florins (about $12). On October 24, 25, 26, and 27, there were four sizable withdrawals from the account aggregating 896,972.25 Dutch florins (about $448,660). It is evident that Amro permitted these withdrawals only because, having already in hand the telecommunication advice from Chase of the $473,272.22 credit for the R.L. Fraise account for the check supposedly drawn by Northern, it could use the credit at Chase to reimburse it for the R.L. Fraise account withdrawals. So it was that, on October 26, Amro credited the R.L. Fraise account with 946,176.13 Dutch florins, the Dutch florin equivalent of the Chase $473,272.22 credit to Amro of the forged Northern check. After the last of the withdrawals from the R.L. Fraise account at Amro on October 27, there was a credit balance in that account of 49,228.33 Dutch florins (Stip., para 26) (about $24,625). Nothing is shown as to who R.L. Fraise is, or where he is, but presumably he is one of the criminal conspirators or the name is fictitious and was used for purposes of the fraud. Thus, within a few days of the receipt by Chase of the forged check and letter, the avails of the forgeries (except for some salvage later to be noted) had been transferred beyond the possibility of recovery.

At the end of November or the beginning of December, 1979, Northern realized that

it had not located a copy of the check here in suit (Northern normally kept a copy of checks it drew) nor any record of a transaction with which that check could be reconciled. Mr. Dziewa examined a microfilm of the check in mid-December but did not recognize the forgery of his signature. He examined the original check on December 26 or 27, 1979, and then determined (from ink color, among other things) that his purported signature on the check was a forgery.

By telephone on December 27 or 28, 1979, Northern notified Chase of "a possible problem relating to the check" (Stip., para 42).

On or about December 28, Chase advised Northern of the letter supposedly signed by Mr. Holman. Since Mr. Holman had no knowledge of any such letter, nor of the check, nor of the transaction, it was then beyond doubt that there had been a fraud. Northern advised Chase that the letter was a forgery and that there was an investigation of the check.

In the fullness of time, this action was commenced.

### 2.

The principal claim pressed by Northern seems to be based on the theory of money had and received, as contained in the second cause of action.

The "money had and received" theory is that Northern paid Chase $473,272.22 "on or about October 23, 1979", that Chase had a duty to inquire of Northern "as owner of the funds Chase received, as to the proper disposition of those funds", and that Chase in violation of a duty to Northern made no inquiry of Northern but relied on a forged letter and paid out "on or about October 23, 1979" the $473,272.22 paid to it by Northern. The quotations are from the second cause of action in the complaint. The decision on which Northern principally relies (Memorandum, pp. 4–9) is *Federal Ins. Co. v. Groveland State Bank*, 37 N.Y.2d 252, 372 N.Y.S.2d 18, 333 N.E.2d 334 (1975) which was "an action for money had and received" (372 N.Y.S.2d at 19–20, 333 N.E.2d at 335–36).

There are initial difficulties with this theory. The check received by Chase was *not* drawn by Northern; it was a forgery and thus could not have imposed on Chase any duty to Northern. The *Groveland* case, where the check to the payee was genuine and authorized, is inapplicable to the facts here. Northern argues (Memorandum, p. 5) that all the cases "hold that the payee bank owes the drawer a duty to inquire as to the proper disposition of the funds". But Northern was *not* the drawer of the check; it did not draw the check. Its signature was forged. Had Northern, the drawee-drawer, refused to pay the forged check as it should have done, Chase would have had to bear the loss, not because it had violated a duty to Northern by failing to inquire but because it could have had no claim against Northern on a forged Northern signature to the check.

The "money had and received" theory of Northern is also based on a mistaken notion of the chronology. Northern seems to argue that when Chase credited Amro with the amount of the check, Chase was dealing with "the proceeds of a check" (Memorandum p. 11) paid by Northern, that is, that Chase was dealing with funds belonging to Northern. This is the timing averred in the complaint as shown above. The sequence of events shown on the record, however, is that Chase did not receive payment of the check from Northern until *after* Chase had made the transfer to Amro.

According to the stipulation of facts, the sequence of events was as follows:

a. October 20, Chase received by mail the check and letter (para 18);

b. October 22, Chase credited the account of Amro at Chase with the dollar amount of the check (paras 22, 23);

c. October 22, Chase forwarded the check "by air" to Federal Reserve Bank of Chicago for presentment to Northern (para 24);

d. October 22, 11:01 p.m., Chase transmitted by radio a message to Amro of the credit to Amro's account with

the name and address of the beneficiary (para 22);

e. October 22, Chase mailed to Amro a "statement copy of previously advised credit" (para 23);

f. October 23, check was presented in Chicago to Northern "by Chase" for payment (para 37; so reads the stipulation, but the presentment must have been by Federal Reserve Bank of Chicago for Chase);

g. October 23, Northern "did not identify any discrepancy", accepted the check as genuine, did not return or otherwise dishonor the check, settled the item as paid, and Federal Reserve Bank of Chicago must have debited the account with it of Northern with the amount of the check (para 37);

h. October 23, Federal Reserve Bank of Chicago instructed Federal Reserve Bank of New York to credit the account of Chase with the amount of the check and on October 23 Federal Reserve Bank of New York did so (para 25).

Thus, Northern paid Chase the amount of the check *after* Chase had already transferred its own funds to Amro (by a credit entry to the account of Amro at Chase).

Northern, when the forged check was presented to it for payment, could and should have returned the check unpaid by reason of the forgery; it was the signature of Northern itself that had been forged. Northern, however, did not return the check but paid it under the mistaken belief that it was genuine.

■ While the *Groveland* decision is of no value as to the duty of the payee of a *forged* check, it is of value as to the principle applicable to an action for money had and received. This principle is that to recover in such an action, it must be shown that it is against good conscience for the defendant to keep the money; the action is founded on equitable principles aimed at achieving justice (372 N.Y.S.2d at 21, 333 N.E.2d at 337).

On which side here do the equities lie?

Chase did not rely "on payment of the check [by Northern] in disbursing the funds" (Northern memorandum, p. 11); it paid its own funds to Amro (by credit entry to Amro) *before* the check was paid by Northern.

■ That Chase did not inquire of Northern when the check was received was no violation of any duty owed Northern. The check was in fact forged, not genuine, and the forged accompanying letter requested transfer of the funds in what would appear to be a normal course of business. The check was not, as in *Groveland*, a genuine one presented by an employee of the drawer asking for diversion of the funds to himself personally, a circumstance which should put a payee bank on notice that something may be amiss.

Northern does, however, point to a few things which, at least with hindsight, might have seemed suspicious.

The check was payable to "Chase Bank International" rather than to Chase Manhattan Bank; the check was dated September 21, the letter was dated October 11, and it was not until October 20, 1979 that they were received by Chase; Northern could have itself made a transfer to Amro and did not need to use Chase for the purpose.

■ But the transfer of funds by Chase to Amro did not cause the loss to Northern. What caused the loss to Northern was simply that, when presented as drawee with the forged check, Northern accepted the check as genuine and paid it. If, as Northern argues, Chase should have been suspicious, then Northern itself, the purported drawer and drawee of the check, should have been much more suspicious. Northern had readily available the supposed signer of the check. He was not asked to verify his signature before the check was paid, and did not do so. Northern had a practice to make "a register carbon copy" of every official check issued by it; the account number, check number, and amount were recorded in a "paid and outstanding" file on computer and microfilm;

the register carbon copy was placed in a "check paying file" (Stip., para 14). There was no such register carbon copy for the forged check in suit, nor any computer nor any microfilm record of it. Northern thus could easily have determined, before paying the check on October 23, that the check had not been issued by it. As Mr. Dziewa, the supposed signer of the check, testified, this could have been done either "immediately" or "before the day is over" (Ex. 5, p. 26). No attempt was made by Northern to verify the signature or to see whether there was a register carbon copy or a computer or microfilm record of issuance of the original. Moreover, had Northern made an attempt to find the register carbon copy of the forged check on October 23, 1979, the absence of any such copy would at once have led to discovery of the fraud. Amro could have been alerted, and all, or a major part, of the loss from the R.L. Fraise account withdrawals might well have been prevented.

The equities on balance are with Chase.

3.

█ Section 3–418 of the Uniform Commercial Code provides in relevant part that "payment or acceptance of any instrument is final in favor of a holder in due course . . . ."

This section itself requires judgment for Chase.

Northern made payment of the check to Chase on October 23, 1979. It so alleges in its complaint (paras 7, 13) and the fact of payment is shown by the evidence.

Chase was payee and endorser of the check. The name of the payee was shown on the check as "Chase Bank International", but both parties treated this at the time as the equivalent of a designation of Chase as payee.

Chase is a holder in due course. "A payee may be a holder in due course." U.C.C. § 3–302(2)

Chase took the check for value, in good faith, and without notice of any defense— the requirements specified in U.C.C. § 3–302(1).

The "value" given by Chase was the credit of the amount of the check to the account of Amro. This credit seems clearly to have been "an irrevocable commitment to a third person", which constitutes "value" as defined in U.C.C. § 3–303(c). Chase made itself liable to Amro on October 22, 1979, for the amount of the check and if Northern on October 23 had dishonored the check, Chase would have borne any loss caused by the forgery. It was in reliance on the credit by Chase that Amro permitted withdrawals to be made from the R.L. Fraise account.

If the credit to Amro by Chase ws not an "irrevocable commitment" when made on October 22, it certainly became "irrevocable" when Amro against that credit paid out in a few days all but a relatively small amount in the R.L. Fraise account (Stip., paras 26, 45).

Under U.C.C. § 4–208(1)(a) Chase acquired a security interest in the check or its proceeds "to the extent to which credit given for the item [was] withdrawn or applied." Such a security interest in an item constitutes value "[f]or purposes of determining [Chase's] status as a holder in due course". U.C.C. § 4–209.

Northern does not contest that Chase took the check for "value". Northern on different grounds does argue (Memorandum, p. 25) that Chase is not a holder in due course.

First, it says that Chase is not a holder because there was no endorsement to Chase. This is apparently based on the difference in names between Chase and "Chase Bank International". But the parties at the time treated the two names as, for all practical purposes, the same; for example, Northern paid the check to Chase with full knowledge that the named payee was "Chase Bank International".

Second, Northern says that Chase did not act in good faith because the name of the payee did not lead Chase to make inquiry. The evidence when taken as a whole, however, establishes that Chase acted in entire good faith and without notice of any fraud.

Finally, Northern says that Chase acted in bad faith because of the name of the payee. This seems but another way to repeat the argument that Chase was not in good faith, an argument which is not available in the face of a finding of fact that Chase acted in entire good faith.

Specifically with reference to the application of U.C.C. § 3–418 Northern argues that "while the final payment rule may apply to the payment of the check by Northern Trust, it does not apply to the transfer of the funds by Chase" (Memorandum, p. 23). This is said to be so because "Chase's credit to Amro was based on the letter, not the check, and thus falls outside the ambit of the final payment rule" (Memorandum, p. 23). This argument cannot be accepted.

Northern is here suing to recover the amount paid by it on an "instrument". That "instrument" was the check, not the letter. It was the check that was presented to and paid by Northern, and not the letter.

The final payment rule embodied in U.C.C. § 3–418 bars any recovery in this action by Northern.

### 4.

The other causes of action averred by Northern deserve only brief comment.

The first cause of action is for conversion. The theory seems to be that after payment of the check on October 23, 1979, Northern "remained the owner" of the funds paid to Chase, that Northern has demanded their return, and that Chase has refused.

 This theory is without any merit. When Northern paid the forged check to Chase, Northern did not remain the owner of any funds paid; it paid simply as the drawee of a check it believed to be genuine. It paid by settlement between banks; there was no specific money nor specific funds of which it could remain an owner. As counsel for Northern correctly state (Memorandum, p. 20): "[T]he check proceeds received by Chase from Northern Trust formed a general deposit of funds at Chase, ..". But, unless there is a specific, identifiable fund, an action for conversion will not lie; a mere claim for moneys paid out by mistake will not support an action for conversion. *Marine Midland Bank v. John E. Russo Produce Co.*, 65 A.D.2d 950, 410 N.Y.S.2d 730, 733 (4th Dep't 1978), *modified on other grounds*, 50 N.Y.2d 31, 405 N.E.2d 205, 427 N.Y.S.2d 961 (1980).

### 5.

The third cause of action is for breach of warranty "on presentment" by Chase as endorser under U.C.C. §§ 3–417(1)(a) and 4–207(1)(a). The theory seems to be that Chase warranted that it had good title to the check whereas it did not have title because there was no endorsement to Chase from "Chase Bank International". This theory is without merit.

The final payment rule of U.C.C. § 3–418 is, by its terms, not applicable to breach of warranty "on presentment", which is the warranty described in U.C.C. § 3–417(1).

Chase, however, did have good title to the forged check presented.

 The parties, as noted, consistently treated Chase at the time as the payee of the check, despite the slight technical difference in the name. An officer of Northern, expert in the field, testified by deposition that in his opinion the endorser and the payee bank were "the same" and "one and the same" (Ex. C–1, p. 18). Moreover, when a check is made payable to a person (which includes a bank) under a name other than his (or its) own, the endorsement may be made in the payee name or the proper name or both. To require endorsement in both names, demand by the payor is necessary. U.C.C. § 3–203. There was never any such demand by Northern.

### 6.

The fourth cause of action is for breach of warranty "on ... transfer" of genuine and authorized signatures. The theory seems to be that, under U.C.C. §§ 3–417(2)(b) and 4–207(2)(b), Chase warranted the signature of the drawer, which was forged, and its own signature as endorser,

but that "Chase Bank International" was the payee and not Chase. This theory is without merit.

Northern concedes (Memorandum, p. 25) that the final payment rule would bar this cause of action, but contends that such rule is inapplicable because Chase is not a holder in due course. Having already found that Chase is a holder in due course, this cause of action is barred.

### 7.

■ The fifth cause of action is for breach of warranty "on ... transfer" of good title to the check and that the transfer to Northern was "otherwise rightful". The theory seems to be that, under U.C.C. § 3–417(2)(a), Chase warranted its title to the check but that the payee was "Chase Bank International" which did not endorse the check.

It appears that Northern does not mean to press this theory because no argument in its support is found in the papers submitted by Northern. In any event, the theory is without merit.

As already pointed out, the technical distinction between the names of Chase and of "Chase Bank International" would not, on the facts here, support a judgment for Northern on this cause of action. Moreover, having already found that Chase is a holder in due course, this cause of action is barred by the final payment rule of U.C.C. § 3–418.

### 8.

The sixth cause of action is for negligence of Chase "in dealing with the forged letter of direction, the forged check and its proceeds" (complaint, para 38).

■ This cause of action is barred by the final payment rule of U.C.C. § 3–418. Northern is here trying to recover back moneys it paid as drawee of a forged check to Chase, the payee of that check. Whether or not Chase was negligent before presentment of the check to Northern, payment of the check, by the law of New York in U.C.C. § 3–418 "is final in favor of a holder in due course", as Chase has been found to be.

■ Aside from this rule, there is no merit to the cause of action. Before the payment by Northern, Chase could not have been negligent in relation to Northern because the check was forged, Northern had no possible liability on the check, and Chase owed no duty to Northern.

After the payment by Northern, Chase acted reasonably and prudently and could not possibly be found negligent. The payment by Northern on October 23, 1979, was an authentication of the check and of the transaction. When Northern paid the check without question, Chase could reasonably assume that the check was genuine and authorized by Northern. It was not until December 28, 1979—more than two months later—that Chase was notified by Northern that the check was a forgery. By December 28, 1979, the loss from the forgery had already occurred. The discovery by Northern of the forgery, and its notice to Chase, were too late to prevent loss.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

There will be judgment in favor of Chase. The judgment should include a direction that Chase pay over to Northern $100,129.21, made up of the sums of $81,559.77 and $18,569.44 recovered by Chase as salvage after discovery of the fraud. See Stipulation, para 45. The parties will probably be able to agree on a form of judgment. Should this not be possible, the judgment will be settled on notice.