Richard **EHRLICH,** Plaintiff,

v.

Edwin A. **HOWE,** Jr., Laurence M. Addington, Susan D. Harrington, Steven B. Callahan, Bruce E. Hood, and Anne L. Strassner, individually and as members of the law firm partnership-in-dissolution known as Sann & Howe and as members of the successor law firm partnership operating under the name of Sann & Howe, Defendants.

No. 92 Civ. 1079 (RWS).

United States District Court, S.D. New York.

April 4, 1994.

**484**

Marcus Borg Rosenberg & Diamond, New York City, for plaintiff; David Rosenberg, of counsel.

Morrison Cohen Singer & Weinstein, New York City, for defendants; Leslie D. Corwin, Jeffrey P. Englander, David A. Piedra, of counsel.

### OPINION

SWEET, District Judge.

This is an action brought by a former partner against his law firm, alleging that his discharge violated provisions of the Employee Retirement Income and Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161–1169 ("COBRA"), and state common law. Defendants Edwin A. Howe, Jr., Laurence M. Addington, Susan D. Harrington, Steven B. Callahan, Bruce E. Hood, and Anne L. Strassner, individually and as members of the law firm partnership-in-dissolution known as Sann & Howe and as members of the successor law firm partnership operating under the name of Sann & Howe (collectively, the "Defendants") have moved for orders pursuant to Rule 56, Fed.R.Civ.P., granting them summary judgment and dismissing the plaintiff's complaint in its entirety, pursuant to 29 U.S.C. § 1132(g)(1) awarding them costs and attorney's fees in this action, and pursuant to Rule 11, Fed.R.Civ.P., imposing sanctions against the plaintiff and his counsel.

Plaintiff Richard Ehrlich ("Ehrlich") has moved for orders pursuant to Rule 56, Fed. R.Civ.P., granting him partial summary judgment on counts II and III of his complaint and denying the Defendants' motion for summary judgment, sanctions, and other relief, and pursuant to Rules 26 and 30, Fed. R.Civ.P. and Rule 612, Fed.R.Evid., granting him the right to review certain documents previously withheld from discovery and to conduct further discovery.

For the following reasons, the Defendants' motion for summary judgment is granted in part and denied in part, and their motion for costs, fees, and sanctions is denied. Ehrlich's motion for summary judgment is granted in part and denied in part, as is his motion for discovery.

### Parties

The parties, facts, and prior proceedings in this matter were discussed fully in a prior opinion of this Court, familiarity with which is assumed. *See Ehrlich v. Howe*, 1992 WL 373266, 1992 U.S.Dist. LEXIS 18269 (S.D.N.Y. Nov. 30, 1992) (the "November 30 Opinion"). Ehrlich resides in the County, City, and State of New York and is a member of the Bar of the State of New York. The individually named defendants are also members of the Bar of the State of New York. Defendant Edwin A. Howe, Jr. resides in Garden City, New York. The other individually named plaintiffs reside in the City, County, and State of New York.

Defendant Sann & Howe (together with its predecessor firms, the "Firm"), was established and has existed as a partnership under the laws of the State of New York to engage in the practice of law and the conduct of a law firm and incidental businesses. At all relevant times, it maintained its principal office at 200 Park Avenue, New York, New York.

### Facts

In June 1989, the members of the Firm of Sann & Howe invited Ehrlich to become a partner of their Firm, which he did on June 5. Ehrlich was listed on the Firm's letterhead as a partner. After he had been at the Firm for six months, Ehrlich signed a Part-

nership Agreement dated December 31, 1989. He signed a subsequent agreement (the "Agreement") on June 29, 1990.

Under the Agreement, a new partner shared joint and several liability for the debts, claims and other liabilities of the Firm, but held no net asset ownership of it during his or her first three years with the Firm. Rather, a new partner's interest in the equity of the Firm vested upon the partner's third anniversary with the Firm. No partner was required to make a capital contribution to the Firm.

Ehrlich, and all other partners except the senior partner, could be expelled from the partnership pursuant to the Agreement by a vote of all the other partners. Upon termination, a partner was entitled to "an amount equal to such partner's net asset ownership as of the date of [termination], less any amounts owing by him to the firm, plus any amounts owing by the firm to him."

On September 25, 1991, two years and three months after Ehrlich joined the Firm, he was terminated by the partnership by the affirmative vote of all the other partners. Ehrlich was not informed about, and was not present at, the partnership meeting at which the vote to terminate him took place. Ehrlich claims that he was terminated for the purpose of preventing him from obtaining any rights to the equity of the Firm.

Ehrlich asserts that a deferred compensation plan exists at the Firm, and both sides agree that Ehrlich would have been entitled to a share of Firm assets exceeding $300,000 upon his third anniversary with the Firm. At the time of his dismissal, at least one other partner had been with the Firm less than three years and was covered by the same terms of the Agreement.

Following the vote to terminate his partnership, Ehrlich received a variety of notices purporting to inform him of his rights under COBRA to continue his coverage under the Firm's health plan. Ehrlich claims that inconsistencies and inaccuracies in these notices constitute violations of COBRA.

### Prior Proceedings

The complaint in this matter was filed on February 13, 1992, and an amended com-

plaint was filed on May 1, 1992. On November 30, 1992, the Honorable Pierre N. Leval of this Court denied the Defendants' motion to dismiss the complaint for failure to state a claim upon which relief could be granted. *Ehrlich v. Howe,* 1992 WL 373266, 1992 U.S.Dist. LEXIS 18269 (S.D.N.Y. Nov. 30, 1992). On December 10, 1993, this case was reassigned to this Court. Argument was heard on the present motions on January 25, 1994, and the motions were considered fully submitted as of that date.

### Discussion

#### Standards Applicable to a Motion for Summary Judgment

A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). The moving party bears the burden of proving that no genuine issue of material fact exists. *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *Pittston Warehouse Corp. v. American Motorists Ins. Co.,* 715 F.Supp. 1221, 1224 (S.D.N.Y.1989), *aff'd,* 954 F.2d 62 (2d Cir.1992).

The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady,* 863 F.2d at 210; *see also Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983); *Swan Brewery Co. v. United States Trust Co.,* 832 F.Supp. 714, 717 (S.D.N.Y.1993).

The remedy of summary judgment is viewed "as an integral part of the Federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citations omitted). Once the moving party has met its burden of coming forward with evidence to show that no material fact exists for trial, the

nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### ERISA Claims

■ Plaintiff claims that his termination violated ERISA § 510, 29 U.S.C. § 1140, which states:

It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit] plan....

Plaintiff contends that the provisions of the partnership agreement providing for the vesting of his net asset interest constituted an ERISA plan and that he was discharged for the purpose of preventing his attainment of his rights under this plan.

Agreements covering only partners are not "employee benefit plans" governed by ERISA. 29 C.F.R. § 2510.3–3 (1991); *see also Robertson v. Alexander Grant & Co.,* 798 F.2d 868 (5th Cir.1986) (holding that plan covering only partners is not an ERISA plan), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987). As Ehrlich concedes, in order to maintain his ERISA action, "as a threshold matter, [he] must be deemed an 'employee' under this federal statute." (Pl.'s Mem. at 6.)

In the November 30 Opinion, this Court stated that the viability of Ehrlich's ERISA claims turned on whether he could prove facts showing that, although a nominal partner, his relationship with the Firm was essentially that of an employee. If he could show such facts, the Firm's plan would cover not only partners, but also at least one employee. The Court expressed doubt regarding whether this claim "could survive a motion for summary judgment." *Ehrlich v. Howe,* 1992 WL 373266, at *4, 1992 U.S.Dist. LEXIS 18269, at *10 (S.D.N.Y. Nov. 30, 1992).

The question of what distinguishes a "partner" from an "employee" for ERISA purposes appears to be one of first impression.

ERISA defines the term "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6). The Supreme Court has noted that this "nominal definition ... is completely circular and explains nothing." *Nationwide Mut. Ins. Co. v. Darden,* — U.S. ——, ——, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992).

ERISA is "intended to remedy discriminatory conduct designed to interfere with the attainment of either initial benefits or, for vested employees, additional benefits." *Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan & Trust,* 787 F.Supp. 838, 845 (N.D.Ill.1992); *see also Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir. 1988) (noting ERISA § 510 is designed to prevent unscrupulous employers from discharging or harassing employees attempting to obtain ERISA rights); *Gavalik v. Continental Can Co.,* 812 F.2d 834, 847 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (noting similarity between § 510 ERISA claims and employment discrimination claims under Title VII).

The statutory definition of "employee" under ERISA is virtually identical to that of the Age Discrimination in Employment Act ("ADEA"), *see* 29 U.S.C. § 630(f), and Title VII, *see* 42 U.S.C. § 2000e(f). In *Hyland v. New Haven Radiology Assocs., P.C.,* 794 F.2d 793, 796 (2d Cir.1986), the Second Circuit stated that, since federal anti-discrimination statutes "have a similar purpose—to stamp out discrimination in various forms—cases construing the definitional purposes of one are persuasive authority when interpreting the others." Consistent with this approach, in *Frankel v. Bally, Inc.,* 987 F.2d 86 (2d Cir.1993), the Second Circuit considered the meaning of "employee" under the ADEA and referred to an ERISA case, *Roth v. American Hosp. Supply Corp.,* 965 F.2d 862, 867 (10th Cir.1992), for guidance.

The Second Circuit looks to cases construing the burden of making out a *prima facie* case of discrimination under Title VII and the ADEA in determining the burden of making out a prima facie case of discrimination under ERISA. *Dister,* 859 F.2d at 1112; *accord Furcini v. Equibank, NA,* 660 F.Supp. 1436, 1442 (W.D.Pa.1987). Accord-

ingly, this Court will look to cases elucidating the distinction between "employees" and "partners" for purposes of the ADEA for persuasive evidence of how this distinction should be drawn for purposes of ERISA.

In *Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F.Supp. 144 (S.D.N.Y.1987), and *Caruso v. Peat, Marwick, Mitchell & Co.*, 717 F.Supp. 218 (S.D.N.Y.1989) (collectively, "*Caruso*"), the defendant moved to dismiss the plaintiff's claim under the ADEA, claiming that his status as a partner[1] in the defendant accounting firm barred his invocation of the ADEA as an employee.

The defendant in *Caruso* was a major American accounting and consulting firm, employing several thousand professionals and consultants in more than 100 offices, with approximately 1,350 partners. Peat Marwick was controlled at that time by a 21 member board of directors, the policies of which were implemented by a six-tier management hierarchy. About 300 of the firms' partners held some form of management position.

This Court rejected a *per se* rule that a partner could not be an employee under the ADEA. The title given to an individual's position is not dispositive; rather, this Court looks to the "individual's actual duties and status." *Caruso*, 664 F.Supp. at 147.

■ The test for distinguishing a partner from an employee requires consideration of all elements of the work relationship. Among the most important factors to be considered is the purported partner's "ability to control and operate the business." "The title 'partner' is not normally applied to an individual whose employment duties are unilaterally dictated by another member of a business." *Caruso*, 664 F.Supp. at 149.

The next important consideration is whether the purported partner receives his or her compensation as a percentage of the firm's profits, rather than in the form of a fixed hourly wage or weekly salary.

The third important consideration is whether the purported partner has a "relatively high level of job security." "The typical firm may not fire a partner or otherwise terminate his employment merely because of disappointment with the quantity or quality of his work, but may only remove the partner in extraordinary circumstances." *Caruso*, 664 F.Supp. at 149.

The first *Caruso* element examines the extent of Ehrlich's control and operation of the Firm. It is undisputed that Ehrlich had the right to vote his 10.7% share of the total partnership shares. Ehrlich has testified that he attended "[v]irtually all" of the partnership meetings while he was at the Firm, and that he spoke at them "[w]hen [he] had something to say." (Corwin Aff.Ex. 5 at 333–34).

The affirmative vote of 80% of the partnership votes was required to adopt all Firm decisions, including the adoption of any amendment to the Agreement, the decision to admit new partners to the Firm, the decision to change the name of the Firm, the decision to terminate the Firm, and the determination to delegate to one or more partners or other persons the authority to make any decision that would bind the Firm. (Agreement, art. IV.) Also, the vote of all other partners was required to decide that a partner was under a permanent disability, (*id.*), or to terminate a partner other than the senior partner (*id.* art. V, § 6).

This means that, by combining his vote with, at most, one other partner, Ehrlich had the power to veto any of these management decisions. This stands in marked contrast to the plaintiff in *Caruso*, who controlled only 350 participation units while some partners controlled 3,300 units and "[v]irtually all of the 300 peat Marwick partners employed in management positions held at least 1,500 units." *Caruso*, 664 F.Supp. at 146. This, of course, does not include the units of the more than 1,000 Peat Marwick partners who were not in management positions. The *Caruso*

---

1. Caruso's actual title at Peat Marwick was "principal" rather than "partner." These terms were used by Peat Marwick as a means to differentiate tasks between its "partner" level workers,

however, and the Court considered the case to turn on distinguishing "partners" from "employees." *See Caruso*, 664 F.Supp. at 145 n. 2.

plaintiff controlled a minute fraction of the participation units of his firm.

Ehrlich claims that the "autocratic" behavior of the senior partner at the Firm eliminated his control of Firm affairs, but this claim is contradicted by his own deposition testimony. Although Ehrlich claims that the senior partner "made it very clear to [him] in a private discussion prior to a partners' meeting that none of [his comments] would be made or entertained," he recalled that at least one of his comments was discussed at the meeting. (Def.'s Aff.Ex. 5 at 146–47.) Clearly, the "autocratic" senior partner was unsuccessful at silencing Ehrlich and, if the discussion of his comments had garnered sufficient support, the Agreement provides that it could have been adopted by vote.

Ehrlich also exercised other forms of control of the partnership business. He brought clients to the Firm, and performed work for them. (Def.Rep.Aff.Ex. 27 at 154–56.) He had "discretion and leeway" with respect to certain client matters. (Ehr.Aff. at 28.) He executed partnership signature cards so he would have authority to sign checks drawn on the Firm accounts, and that he did write such checks. (Pl.'s Mem. at 10.) He signed a counsel agreement with a retiring partner as a partner of the Firm. (Corwin Aff.Ex. 6.) He was a member of Firm Committees, (Ehr.Aff. at ¶ 31), and he interviewed prospective associate attorneys and paralegals, after which he made recommendations regarding their employment, (Ehr.Aff. at ¶ 29, Def.Aff.Ex. 5 at 249–50). As a partner handling primarily real estate matters, he was shown the resumes of prospective real estate paralegals. (Ehr.Aff. at ¶ 29).

Also distinguishing the scope of the power exerted by Ehrlich from that exerted by the plaintiff in *Caruso* is the fact that the *Caruso* plaintiff was prohibited from holding himself out to the public as a partner, from holding the positions of Chairman and Deputy Chairman, and from signing the firm's name on any report that expressed an opinion as to a client's financial statements. *Caruso*, 717 F.Supp. at 219. Contrary to the plaintiff in *Caruso*, Ehrlich exercised control consistent with the position of a partner in the Firm.

The second *Caruso* factor analyzes the extent to which Ehrlich's compensation was calculated as a percentage of Firm profits. According to the Agreement, Ehrlich "share[d] in all net profits (computed on a cash basis) and [bore] all losses of the firm on the basis of the units of participation held by each partner." (Agreement at 5.) Ehrlich had 32.5 units, the same as Defendant Strassner. Three other partners had 40 units, one had 45 units, and the senior partner had 75 units.

Defendants assert, and Ehrlich does not contest, that his 1989 and 1990 compensation was a share of profits. (Pl.'s Mem. at 37.) There was apparently some confusion over Ehrlich's draw for 1991, but this confusion is insufficient to contradict the express terms of the Agreement that partners' remuneration would be a share of the profits of the Firm, and the fact that this procedure was followed in 1989 and 1990.

Also, it is undisputed that if the Firm lost money, each partner would be responsible for making good that loss on a *pro rata* basis.[2] Ehrlich, in fact, executed a "continuing guaranty" to Citibank, N.A. for the Firm's borrowing from that bank, and admits that he "was liable, as each Partner Defendant, for all Firm debts and obligations." (Amend.Comp. ¶ E.) These facts indicate that, as a matter of course, Ehrlich's compensation was determined as a share of the Firm's profits.[3]

---

**2.** Ehrlich contends that he was not liable for certain specified Firm obligations if the Firm was terminated or dissolved. He was, however, at least liable for the Firm's operating losses.

**3.** The Agreement contained a provision whereby, if the Firm's net profits were in excess of $160,000 multiplied by the number of partners, then any partner who would receive less than $160,000 according to the ordinary computation would receive $160,000 that year, with the differ-

ence to be made up by the more highly-paid partners. This provision applied to all partners, however, and was meant to ensure that, assuming adequate firm-wide profitability, all partners would receive a minimum of 160,000. *See* Agreement at 6. However, if the firms net profits for a given calendar year were less than $160,000 multiplied by the number of partners, the net profits were to be divided equally among all partners. Except in the specific, apparently eleemosynary provision triggered when a partner

The final *Caruso* factor looks at Ehrlich's employment security to determine if partners in the enterprise have greater job security than employees. Ehrlich concedes that his termination required a unanimous vote of all other partners. (Pl.Aff. ¶ 29). If Ehrlich could have convinced one other partner not to terminate his association with the Firm, or even to have abstained from voting, he would not have been terminated. Also, he was not subject to yearly performance evaluations, and the Partnership Agreement was unlimited in duration.

In *Caruso*, the court noted that the plaintiff underwent yearly performance evaluations for the purpose of determining whether he was entitled to continue working at the Firm. Moreover, he could be, and was, terminated by a single partner in charge of his office, acting alone, and without the necessity of a vote or the approval of any other partner.[4]

Application of the relevant factors indicates that Ehrlich was, in fact, a partner at the Firm. Ehrlich has failed to come forward with evidence to suggest that the Firm's "plan," if it exists, covers anything other than partners. Summary judgment is accordingly granted dismissing his ERISA claims.

### COBRA Claims

■ COBRA requires an employer whose health plan is covered by the Act to provide notice to a terminated employee of his or her right to elect continuation coverage under the plan. The employee has a minimum of 60 days from termination or notice, whichever is later, to elect continuation coverage. 29 U.S.C. § 1165(1).

Ehrlich received a notice on October 31, 1991, marked "EFFECTIVE DATE: September 25, 1991." (Corwin Aff.Ex. 14.) Under COBRA, his election period should have run for 60 days from notice, to December 31,

1992. The notice provided for an election period of only 30 days, to November 30, 1991.

On November 8, 1991, the Firm's Office Administrator wrote to Ehrlich, discussing certain facts related to his COBRA coverage. (Def.'s Ex. 16). On November 21, 1991 Ehrlich received another notice which stated: "You have 60 days from the date of your termination (September 25, 1991) to let me know your decision to continue your coverage." (Corwin Aff.Ex. 18). The notice thus provided for an election period of only 25 days from the first notice, and only 4 days from this second notice. The notice further stated that unless his answer and payment for an insurance premium were received by November 30, the Firm would be "required to remove him and his family from the Firm's insurance policies" and he would "not have any future right to elect COBRA coverage."

On November 27, 1991, the Defendants' counsel wrote to Ehrlich's counsel, informing him that any election made by Ehrlich would be "without prejudice to the rights of either of the parties," and warning that failure to make an election could result in loss of coverage. (Def.'s Ex. 20). On December 4, 1991 defendants sent a letter to Ehrlich setting forth two possible election periods, one ending December 8, 1991 and the other ending December 30, 1991. Defendants wrote that "[w]e cannot, of course, assure you that [the Firm's insurance carrier] will agree with this reading" and that "[i]t would presumably be more difficult to convince the carrier to accept this interpretation, but we will make this request if you wish us to do so." (Def.'s Ex. 22).

At no time did Ehrlich receive a notice that both informed him of his rights to elect continued coverage, and provided him with a sixty-day prospective period in which to make that election. Ehrlich obtained re-

---

fared considerably worse than his or her colleagues, all partners remuneration was determined as a share of the Firm's net profits.

4. The Articles of Partnership of the defendant accounting firm in *Caruso* provided that an involuntary resignation of a partner could be effected only upon a two-thirds vote of the partnership. However, the plaintiff alleged that he was led to

believe that there was no procedure to effect this vote, and that once a senior partner asked him to resign, he had no recourse. *Caruso*, 717 F.Supp. at 222. In addition, Ehrlich would have been required to convince one partner to oppose, or at least not support, his expulsion. The plaintiff in *Caruso* would have needed to convince 450 partners not to support his expulsion.

placement health insurance coverage effective January 1, 1992.

In *Communication Workers v. NYNEX Corp.*, 898 F.2d 887 (2d Cir.1990), the Second Circuit held that confusing or misleading notices about the duration of the election period and the 45 day grace period for payment of an initial premium for continuation coverage demonstrated that the plaintiff employees were likely to succeed on the merits of their COBRA claims.

However, several courts have held that good faith efforts to comply with COBRA notice requirements are sufficient for compliance with the statute. *See Hubicki v. Amtrak Nat'l Passenger R.R.*, 808 F.Supp. 192, 196–97 (E.D.N.Y.1992). In *Conery v. Bath Associates,* 803 F.Supp. 1388, 1398–99 (N.D.Ind.1992), the plaintiff employee's children argued that, even if their father had received his COBRA notice, they were entitled to summary judgment on their COBRA claims because they had not received individual COBRA notices. The court held that, under the "good faith" standard, the notice sent to the father was "reasonably calculated," following "common sense," to inform his children of their COBRA rights.

It is undisputed that the Firm supplied Ehrlich with several notices related to his COBRA benefits, all of which, they claim, were part of a good faith effort to apprise Ehrlich of his rights and to facilitate his exercise of them. They claim that it was Ehrlich who demonstrated bad faith by refusing to act on their notices because the notices referred to a September 25 termination date, which he believed could compromise his ability to protest the termination of his position with the Firm, even though they had informed his attorney that any election of coverage would be without prejudice to the rights of either of the parties.

"Summary judgment is notoriously inappropriate for determination of claims in which issues of … good faith and other subjective feelings play dominant roles." *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir.1993) (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)). Since a question of fact remains regarding whether the Defendant's efforts were sufficient to constitute good faith compliance with the notice requirements of COBRA, summary judgment cannot be granted in favor of any party.

Ehrlich also contends that defendants offered to pay him two months compensation in exchange for a general release of his claims, and that this action is itself a violation of COBRA. In *Branch v. G. Bernd Co.*, 764 F.Supp. 1527, 1533 n. 10 (M.D.Ga.1991), *aff'd,* 955 F.2d 1574 (11th Cir.1992), the District Court for the Middle District of Georgia stated that withholding money or other benefits already owed to an employee in order to compel the employee to make and election, or a waiver of COBRA rights would be a violation of COBRA.

In support of this claim, Ehrlich submits a Memorandum dated October 29, 1991 which appears to indicate that the Firm offered him the balance of a partner's draw through November 1991, in return for a general release. Ehrlich has not submitted sufficient evidence that this money was already owed to him, so that the withholding of it violated COBRA, to justify granting summary judgment in his favor.

### Breach of the Partnership Agreement

█ Count III of Ehrlich's Amended Complaint alleges breach of the Agreement and of his partners' fiduciary obligations, primarily through their excluding him from the "secret" meetings at which they voted to expel him from the partnership.

█ Under New York law, partners have no common law or statutory right to expel another partner from the partnership. A partnership agreement may provide for the expulsion of partners under prescribed conditions, but such provisions are strictly applied. *Millet v. Slocum,* 4 A.D.2d 528, 532, 167 N.Y.S.2d 136 (4th Dept.1957) (expulsion of partner that was not carried out in strict conformity with terms of expulsion provisions in partnership agreement constituted breach of partnership agreement), *aff'd,* 5 N.Y.2d 734, 177 N.Y.S.2d 716, 152 N.E.2d 672 (1958); *Framson, Inc. v. Queens Inner Unity Cable Sys.*, 168 A.D.2d 419, 562 N.Y.S.2d 545, 546 (2d Dept.1990) (failure to comply strictly with specific expulsion provisions in joint venture

agreement resulted in no expulsion of joint venturer).

In addition, all partnership agreements in New York include "an implied term of good faith." *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977). Among partners, this duty rises to one of "finest loyalty" and "honor most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545 (1928). The fiduciary duties owed by partners are defined by the terms of the partnership agreement. *Cooper Dev. Co. v. Friedman*, 1994 WL 62846, at *4–5, 1994 U.S.Dist. LEXIS 1814, at *12 (S.D.N.Y. Feb. 22, 1994).

The Agreement contains the following exclusive provisions for expelling a partner:

Article IV. Voting of Partners as to Firm Decisions

Every Partner shall have one partnership vote for each unit of participation held by him. . . .

A partner shall not vote, however, and the number of partnership votes shall be deemed reduced by the number of partnership votes appertaining to such partner:

.     .     .     .     .

(b) *if the issue before the partnership is* whether such partner . . . should be expelled.

*Except only as provided in the preceding paragraph of this Article IV, no partner shall be disqualified from voting on any issue* . . . .

.     .     .     .     .

[Article V] 6. Expulsion of a partner.

A partner other than the senior partner may be expelled from the Firm upon the affirmative vote of all the other partners.

(Emphasis added.)

The Agreement defines the term "partner" as including "all partners, individually, whose membership has not been terminated." (Art. I, p. 3.) The Agreement states:

*Upon the* . . . *expulsion* of one or more partners . . . the term[ ] "firm" . . . shall thereafter refer to that part of the membership of the firm which includes the person who was the senior partner at the time of such . . . expulsion. . . .

(*Id.* (emphasis added).)

Finally, the Agreement provides that the terms "firm" and "partnership" are interchangeable. (*Id.* at 2).

The Agreement thus defines the Partnership, prior to the expulsion of a partner, as including all of the persons defined as "partners." The expulsion and voting provisions in the Partnership Agreement require that the issue of the expulsion of a partner be "before the partnership," i.e., before all of the partners. Thus, in order for an expulsion vote to be "before the partnership," all of the partners, including any partners whose expulsion is under consideration, must be notified that the vote is taking place. This is an important right conferred by the expulsion provisions in the Agreement because, as argued by the Defendants in opposition to Ehrlich's ERISA claims, a partner facing expulsion only needed to garner the support of one colleague to avoid termination.

Certain of the Defendants concede that all partners had the right to participate in partnership meetings, (Pl.'s Ex. B, at 385–86), and that Ehrlich was intentionally "excluded from two meetings which addressed his termination from the firm," (*Id.* at 386). Defendant Howe testified that the one partner previously expelled from the Firm was present at the meeting which addressed his termination. (Pl.'s Ex. A at 110–12).

The Defendants argue that the Partnership Agreement does not require a meeting for a vote to expel a partner, which could be effected by circulating memoranda. Even if this assertion were true, the issue would still have to be "before" the partnership, and Ehrlich would be entitled to notification that such a "vote" was taking place.

An unambiguous partnership agreement should not be rewritten by the court. *Silverman v. Caplin*, 150 A.D.2d 673, 674, 541 N.Y.S.2d 546 (2d Dept.1989) (collecting cases). As discussed above, expulsion provisions must be applied strictly, and these provisions define the fiduciary duties owed among the partners.

Since the issue of Ehrlich's expulsion was not "before the partnership," the Defendants' vote to expel Ehrlich breached the Partnership Agreement and their fiduciary duties. Ehrlich's motion for summary judgment as to liability on Count III of the Amended Complaint for breach of the Partnership Agreement and for breach of fiduciary duties is granted.

### Conversion

■ Ehrlich's last claim is for conversion and asserts that the actions of his partners worked a conversion of his deferred compensation, and entitle him to the payment of "an amount not presently known but believed to exceed $300,000, the full amount of which will be established upon trial,· plus punitive damages," in addition to his normal draw and share of the Firm's net profits for the period from January 1, 1991 through June 6, 1992.

■ This claim ·is one for conversion of monies owed to Ehrlich under the Agreement. An action for conversion of money is insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession. An action of conversion does not lie to enforce a mere obligation to pay money. *Resources Funding Corp. v. Congrecare, Inc.*, 1994 WL 24825, at *8–9, 1994 U.S.Dist. LEXIS 508, at *25–26 (S.D.N.Y. Jan. 19, 1994); *Northern Trust Co. v. Chase Manhattan Bank, N.A.*, 582 F.Supp. 1380, 1386 (S.D.N.Y.), *aff'd*, 748 F.2d 803 (2d Cir.1984); *Stack Elec., Inc. v. DiNardi Constr. Corp.*, 161 A.D.2d 416, 555 N.Y.S.2d 346 (1990).

Ehrlich provides only a one sentence defense of this claim, *sans* citation. Since Ehrlich's fourth claim for conversion is insufficient as a matter of law, it must be dismissed.

### Discovery of the Deposition Memorandum

■ Ehrlich deposed individual Defendants Strassner and Howe in the course of this litigation. Both of these Defendants reviewed a memorandum (the "Memorandum") that contained factual information about this case before their depositions.

Defendant Strassner brought a copy of the Memorandum with her to the deposition, however, Defendants' counsel refused to permit its production. Defendants' counsel also objected to all questions about the September 23, 1991 meeting at which Ehrlich's expulsion was a topic of discussion and directed Strassner and Howe not to answer questions about the meeting based upon a claim of attorney-client privilege.

On September 10, 1993 Judge Leval denied Ehrlich's application to review the Memorandum, finding that it was "unquestionably work product within the protection of rule 26(b)(3) (and may well be entitled to the protection of attorney client privilege as well)," but directed that the depositions of Strassner and Howe be continued to permit a determination of what was said at the September 23 meeting and whether any of it was privileged. When these depositions were continued, however, these Defendants professed a nearly complete lack of memory regarding the September 23 meeting, who spoke there, or what was said.

Fed.R.Civ.P. 26(b)(3) reads in pertinent part as follows:

> Trial Preparation: Materials.... [A] party may obtain discovery of documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Thus, if a party prepared a document in anticipation of litigation or for trial, that party's adversary may not obtain disclosure of that document unless the adversary has "substantial need" for it in preparing its case

and is unable to obtain its equivalent by other means without undue hardship. The point of the doctrine, as explained in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), is that "[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Hickman*, 329 U.S. at 516, 67 S.Ct. at 396.

The second sentence of Rule 26(b)(3) provides heightened protection for "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." However, the privilege against disclosure of an attorney's mental impressions, conclusions, opinions and theories is not "absolute" and may have to yield in appropriate circumstances. *See, e.g., In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir.1982).

A situation similar to the one at bar was addressed in *Redvanly v. NYNEX Corp.*, 152 F.R.D. 460 (S.D.N.Y.1993), a suit brought under Title VII and various state law claims. At a pretrial conference, the plaintiff's attorney sought discovery of notes (the "Notes") made by the defendant's in-house counsel of a meeting at which termination of the plaintiff's employment was discussed. The Notes had been read by certain of the plaintiff's deponents prior to their giving testimony of the events that transpired at the meeting. In their depositions, the deponents claimed to have no or limited recollection of events that took place at the meeting.

The Court held that, even if the Notes were work product, the plaintiff would be entitled to them because she had shown a "substantial need" for them and was unable to obtain their equivalent by other means. This was true because the facts of what transpired at the meeting were a critical issue, and because of the professed partial lack of recollection by the deposed defendants who had reviewed the Notes just before their depositions.

*Xerox Corp. v. International Business Machines Corp.*, 64 F.R.D. 367 (S.D.N.Y. 1974), involved allegations by Xerox that IBM personnel had misappropriated Xerox trade secrets during the course of developing a new commercial copier. An in-house attorney for IBM, in anticipation of the litigation which Xerox was expected to bring, interviewed 37 IBM employees regarding the use of alleged Xerox trade secrets at IBM.

After suit was brought, Xerox deposed 23 of the 37 employees who generally testified that they were unable to recall the extent of their access to and use of Xerox documents. This Court held that the attorney's notes of his interviews with the 23 deposed persons were to be produced because, insofar as these persons testified at the time of deposition they had little recollection of events at issue, Xerox had established substantial need for the notes. *Xerox*, 64 F.R.D. at 382.

Federal Rule of Evidence 612 provides a wholly independent basis for ordering disclosure of the Memorandum, even if it is work product or protected by the attorney-client privilege. This Rule provides in relevant part that if, before testifying, "a witness uses a writing to refresh memory for the purpose of testifying ..., if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced ... to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness."

The "potential for conflict [that] exists between Rule 612, which favors disclosure of materials used to refresh a witness' recollection, and the work-product privilege" is resolved by the courts on a case-by-case basis by balancing "the competing interests in the need for full disclosure and the need to protect the integrity of the adversary system protected by the work-product rule." *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 119 F.R.D. 4, 5 (E.D.N.Y. & S.D.N.Y. 1988). Also, when "[c]onfronted with the conflict between the command of Rule 612 to disclose materials used to refresh recollection and the protection afforded by the attorney-client privilege ... the weight of authority holds that the privilege ... is waived." *S & A Painting Co. v. O.W.B. Corp.*, 103 F.R.D. 407, 408 (W.D.Pa.1984) (collecting cases); *see also United States v. Marcus Schloss & Co.*,

1989 WL 62729, at *4, 1989 U.S.Dist. LEXIS 6271, at *11 n. 2 (S.D.N.Y. June 5, 1989).

Rule 612 is applicable to depositions pursuant to Fed.R.Civ.P. 30(c). *Al–Rowaishan Establishment Universal Trading & Agencies, Ltd. v. Beatrice Foods, Co.*, 92 F.R.D. 779, 780 n. 1 (S.D.N.Y.1982); *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 144 (D.Del.1982). The *Redvanly* Court relied on Rule 612 as an alternative basis for ordering the disclosure of the Notes at issue in that case. *Redvanly v. NYNEX Corp.*, 152 F.R.D. at 469–470 (S.D.N.Y.1993).

Accepting Judge Leval's determination that the Memorandum is work product, Ehrlich has met the "substantial need" standard and is entitled to its disclosure. In addition, Ehrlich is entitled to the Memorandum under Rule 612 even if it is work product or protected by the attorney-client privilege. The Defendants may, if they choose, submit the Memorandum to the Court for a determination of whether any portions therein contain solely an attorney's mental impressions, conclusions, opinions and legal theories and, if so, whether deletion of such portions would be appropriate and feasible prior to production. *Cf. Xerox*, 64 F.R.D. at 382.

As this Court's scheduling order entered on June 30, 1993 shows, discovery in this action was closed on August 30, 1993. While Ehrlich has provided reasons for permitting him access to the Memorandum, he has not provided a reason why he should be permitted to conduct other further discovery. With the exception of the request related to the Memorandum, therefore, Ehrlich's discovery requests are denied.

### Costs, Attorneys' Fees, and Sanctions

■ ERISA permits a court to award costs and attorneys' fees "to either party" in an ERISA action. 29 U.S.C. § 1132(g)(1). The decision to award attorneys' fees is based on five factors:

(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Mendez v. Teachers Ins. & Annuity Ass'n & College Retirement Equities Fund*, 982 F.2d 783, 788 (2d Cir.1992) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir.1987)).

In addition, Rule 11, Fed.R.Civ.P., provides for the imposition of sanctions when:

(1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify, or reverse the law as it stands.

*International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989).

The Defendants move for costs, attorneys' fees, and sanctions pursuant to both ERISA and Rule 11 because they claim that Ehrlich's ERISA claim was clearly without merit.

As discussed above, Judge Leval denied the Defendants' motion to dismiss this claim, stating that it was "possible" that Ehrlich would succeed. *Ehrlich v. Howe*, 1992 WL 373266, at *4, 1992 U.S.Dist. LEXIS 18269, at *10 (S.D.N.Y. Nov. 30, 1992). As the lengthy discussion of Ehrlich's ERISA claim herein signifies, this claim, although dismissable upon summary judgment, was supported by cogent legal argument and a marshalling of the facts. Ehrlich has likewise shown no justification for imposing costs or sanctions on the Defendants.

### Conclusion

For the reasons discussed above, the Defendants' motion for summary judgment is granted in part and denied in part. The Defendants' motion for costs, attorneys' fees, and sanctions is denied. Ehrlich's motion for summary judgment is granted in part and denied in part, as is his motion for discovery.

It is so ordered.