THIS DISPOSITION IS
CITABLE AS PRECEDENT OF
THE TTAB

Mailed: March 12, 2003

Paper No. 19
BAC

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

Genesco Inc. and Genesco Brands Inc., joined as party
plaintiffs[1]
v.
Gregory Martz

_____

Opposition No. 121,296
to application Serial No. 75/707,767
filed on May 17, 1999

_____

Virginia S. Taylor and Christine M. Cason of Kilpatrick
Stockton LLP for Genesco Inc. and Genesco Brands Inc.

Douglas M. Vickery of Law Offices of Douglas M. Vickery for
Gregory Martz.

_____

Before Seeherman, Chapman, and Rogers, Administrative
Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

---

[1] The records of the Assignment Branch of the United States
Patent and Trademark Office (USPTO or Office) indicate that
opposer's involved registrations have been assigned to Genesco
Brands Inc. (a Delaware corporation).  (See reel 161, frame 518
and reel 2365, frame 925.)  Accordingly, Genesco Brands Inc. is
hereby joined as a party plaintiff.  See Patent and Trademark
Office Rules 3.71(d) and 3.73, and Fed. R. Civ. P. 17, 19 and
25(c).  However, for the sake of simplicity in this decision,
opposers will be referred to in the singular as "opposer."

Genesco Inc. (a Tennessee corporation) filed an opposition against the application filed on May 17, 1999 by Gregory Martz (an individual residing in California) to register on the Principal Register the mark shown below



for "T-shirts, surftrunks, sweatshirts, sweatpants, shirts, tank tops, jackets, shorts, socks and pants" in International Class 25.  Applicant inserted the following description of the mark:  "The mark consists of a thumbprint, the letters 'GM,' and the wording 'custom fiberglassing' and 'waterproof.'"  Applicant disclaimed the word "waterproof."  The application also includes the following statement:  "The initials 'GM' and thumbprint forming part of the mark are those of Gregory Martz whose consent to the registration of both as part of the trademark are [sic-is] implied by his signing of the application."  The application is based on applicant's claimed date of first use and first use in commerce of June 1, 1983.

As grounds for opposition, opposer alleges that it "is the owner of the trademark J&M which has been used throughout the United States in relation to the famous JOHNSTON & MURPHY shoes" since April 21, 1892; that opposer

2

has "continuously used the J&M mark in relation to footwear, clothing, fashion accessories, leather goods, retail store services and other goods and services" (paragraph 1); that opposer owns four registrations (opposer's "J&M marks"), specifically, the mark J&M[2] and the marks shown below



[3] [4];

that through opposer's continuous and extensive sales and advertising of its "J&M Marks in connection with quality

---

[2] Registration No. 1,721,290, issued on October 6, 1992, for goods and services in International Class 3 (various leather care and shoe care products and various closet accessories) with claimed first use in February 1975, Class 18 (various leather accessories) with claimed first use on August 15, 1989, Class 21 (goods such as shoe horns, cedar shoe trees) with claimed first use in February 1975, Class 25 (various men's and women's footwear and apparel, including "hosiery") with claimed first use in 1892, and Class 42 ("retail and mail order services in the field of men's and women's footwear, apparel and fashion accessories") with claimed first use on November 20, 1971, Section 8 affidavit accepted, Section 15 affidavit acknowledged, renewed.

[3] Registration No. 124,004, issued on December 31, 1918, for "boots and shoes made of materials comprising leather, canvas, rubber, sole compositions and combinations of the same" in International Class 25 with claimed first use on April 21, 1892, Section 8 affidavit accepted, Section 15 affidavit acknowledged, fourth renewal.

[4] Registration No. 1,294,579, issued on September 11, 1984, for "men's shoes" in International Class 25 with claimed first use in October 1982, Section 8 affidavit accepted, Section 15 affidavit acknowledged; and Registration No. 1,734,916, issued on November 24, 1992 for various men's and women's footwear and fashion accessories and "hosiery" in International Class 25, with claimed first use in October 1982 and "retail store services in the field of men's and women's footwear and fashion accessories" in Class 42, with claimed first use on November 20, 1971, Section 8 affidavit accepted, Section 15 affidavit acknowledged, renewed.

footwear and related apparel and accessories and in connection with the well-known chain of JOHNSTON & MURPHY retail stores" (paragraph 3), the J&M marks are widely known throughout the United States; that the J&M marks are symbolic of the substantial goodwill and consumer recognition opposer has established; that by reason of opposer's extensive use and advertising of the J&M marks and the resulting public recognition, opposer's J&M marks "uniquely identify Opposer and its products and services to the public and J&M is a famous mark within the meaning of 15 U.S.C. §1125(c)"; that opposer has used its J&M marks since long prior to the date of applicant's application; and that applicant's mark, when used on his goods, so resembles opposer's previously used and registered marks, as to be likely to cause confusion, mistake, or deception in contravention of Section 2(d) of the Trademark Act. Opposer further alleges that "registration and use of Applicant's mark would dilute the distinctive quality of Opposer's famous and incontestable J&M Marks." (Paragraph 7.)

In applicant's answer he denies the salient allegations of the notice of opposition.

Both parties have filed briefs on the case. Although opposer requested an oral hearing, both parties subsequently waived oral argument.

4

## The Record/ Evidentiary Matters

During trial in this case, opposer took the testimony deposition of Jason Dasal, director of retail marketing for Johnston & Murphy, a division of Genesco Inc., and submitted one notice of reliance on three types of materials, namely, status and title copies of seven of opposer's registrations under Trademark Rule 2.122(d), the testimony deposition of Jason Dasal (filed when transcribed by the court reporter)[5], and copies of documents "produced by Applicant in response to Opposer's discovery requests."

Applicant took the testimony deposition of Gregory Martz (applicant), and submitted one notice of reliance on four items, namely, a status and title copy of applicant's Registration No. 2,379,130[6], the testimony deposition of Gregory Martz (filed when transcribed by the court

---

[5] Both parties are advised that trial testimony depositions are not filed under a notice of reliance. Rather, under Trademark Rule 2.125(a) one copy of the transcript (with exhibits) is to be served on each adverse party within 30 days of the completion of that testimony. Under Trademark Rule 2.125(c) one certified transcript (with exhibits) is to be filed with the Board (setting forth no time deadline therefor), along with a notice of the filing with the Board served on each adverse party. See The Sports Authority Michigan Inc. v. PC Authority Inc., 63 USPQ2d 1782, footnote 4 (TTAB 2002).

[6] This registration issued August 22, 2000 to applicant for the identical mark as that shown previously herein for "applying fiberglass coatings to surfboards and sailboards to the order and specification of others" in International Class 40 with a claimed date of first use of June 1, 1983. The words "custom fiberglassing" and "waterproof" are disclaimed. The registration includes the following statements: "The mark consists of the letters 'GM,' a thumbprint and wording 'custom fi[b]erglassing' and 'waterproof.'" "The initials 'GM' are those of Gregory Martz whose consent is of record."

reporter), copies of applicant's first set of interrogatories to opposer, and opposer's responses thereto.

At opposer's deposition of Jason Dasal, Mr. Roger G. Sisson, secretary and general counsel of Genesco Inc. (in person), and Ms. Virginia S. Taylor (via telephone) appeared for opposer, and Mr. Douglas M. Vickery (via telephone) appeared for applicant. On cross-examination the witness was asked (i) if he had been referring to any notes in offering responses, to which he answered "Yes"; and (ii) who prepared the notes, to which he answered himself, "Roger Sisson, our corporate attorney, and Virginia Taylor with Kilpatrick and Stockton." A discussion then occurred in which applicant's counsel requested that those notes be faxed to him on the basis that applicant is entitled to anything the witness reviews during his deposition. Opposer's attorney (Ms. Taylor) contended the witness need not testify "further on the substance of any communications with counsel or on any documents which constitute work product of counsel." Applicant's counsel explained his position, that if the witness is "reviewing [the notes] and reading from them at his deposition, you've waived the privilege." Opposer's counsel (Ms. Taylor) stated applicant's attorney could "present that argument to the Board." (Dep., pp. 32-34.)

In his brief after trial, applicant objected to the direct testimony of Mr. Dasal (which includes the introduction of all 24 exhibits) specifically requesting that the direct examination portion of the deposition be excluded from the record based on opposer's refusal to provide applicant with a copy of the notes used by the witness at his deposition.

Opposer responded to the objection in its reply brief on the case, arguing that applicant "did not file a motion to require production of the notes or any other motion with the Board" (reply brief, p. 6); that applicant should have raised this issue with the Board by "filing an appropriate motion promptly after the conclusion of the testimony deposition" (reply brief, p. 7); and that by failing to follow up on the objection prior to the briefing stage, applicant has waived its objection.[7]  In support of its argument, opposer cites Trademark Rules 2.123(e)(3), (j) and (k), Fed. R. Civ. P. 32(d)(1),(2) and (3)(A) and (B); and TBMP §§718.02 and 718.03, apparently taking the position the objection made by applicant at the deposition was procedural in nature and applicant was obligated to take an interim

---

[7] Opposer stated that applicant should not be permitted to request that the entire testimony deposition be excluded, but applicant did not so request.  He asked only that the direct examination portion be excluded.

7

action on his objection, prior to the filing of his brief on the case.

It is important to note that while inter partes proceedings before the Board are similar to a civil action in Federal District Court, because the Board is an administrative tribunal with jurisdiction over the issue of registrability only,[8] our rules and procedures necessarily differ in some respects from those prevailing in Federal district courts. See Yamaha International Corp. v. Hoshino Gakki Co., Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988). For example, the Board does not preside at the taking of testimony depositions; rather, all depositions are taken outside the presence of the Board and the written transcripts (with any exhibits thereto) are then filed with the Board.[9] Thus, it has long been the policy of the Board not to read trial testimony and review evidence prior to submission of the case to a panel of judges for final decision, and motions to strike which involve substantive matters are deferred until final decision. See Weyerhaeuser Co. v. Katz, 24 USPQ2d 1230, 1233 (TTAB 1992); and New York State Office of Parks and Recreation, v. Atlas Souvenir & Gift Co., 207 USPQ 954, 956 (TTAB 1980). See also, TBMP

---

[8] See Section 17 of the Trademark Act, 15 U.S.C. §1067. See also, Trademark Rules 2.116(a), 2.120(a) and 2.122(a); and TBMP §101.
[9] For a comparison of "discovery depositions" and "testimony depositions" in Board inter partes proceedings, see TBMP §404.02.

§§102.03 and 501.02; and Louise E. Fruge, TIPS FROM THE TTAB: An "Object" Lesson, 72 TMR 211 (1982). Because the parties will not know in an inter partes Board proceeding until final decision whether a substantive objection has been sustained or overruled, it is evident that parties should proceed with their case through trial mindful of that aspect of Board practice.

We first consider whether applicant has properly preserved his objection or whether, by failing to file a motion to strike earlier in the proceeding, he has waived his objection.

If a party objects on procedural grounds to testimony or a notice of reliance (e.g., improper or inadequate notice of a witness, untimely notice of reliance), the objecting party should promptly file a motion to strike the testimony or notice of reliance; and failure to do so will generally result in a waiver of the procedural objection. However, with regard to substantive objections (e.g., improper rebuttal, hearsay), these need not be raised by motion, but rather should be raised in the objecting party's brief on the case. See TBMP §§533, 534, and 718, and rules and cases cited therein.

We find the objection to the failure of opposer to provide applicant with the notes to which the witness was referring during his testimony is substantive, not

9

procedural in nature, because the objection is to the substance of the testimony being based on notes read by the witness rather than on the witness's own recollection. Inasmuch as this is a substantive matter, applicant's raising the objection to the direct examination of Jason Dasal at the time of the testimony deposition and preserving the objection in applicant's brief on the case was proper and sufficient.

Turning now to the issue of whether opposer was obligated to provide the notes used by the witness during his testimony, applicant, citing Fed. R. Evid. 612, Trademark Rule 2.123(e)(3), and Thomas Bailey v. Meister Brau, Inc., 57 F.R.D. 11 (ND IL 1972), argues that applicant is entitled to a full opportunity to cross-examine the witness; that applicant was deprived of that opportunity due to opposer's refusal to turn over the notes used by the witness; and that when the witness uses what may otherwise be a privileged document on the stand to refresh his or her memory, there has been a voluntary, knowing disclosure of the contents of the document and the privilege is waived.

Fed. R. Evid. 612 -- Writing Used to Refresh Memory, reads, in relevant part, as follows:

> [I]f a witness uses a writing to refresh
> memory for the purpose of testifying,
> either—
>     (1)  while testifying, or
>     (2)  before testifying, if the
>         court in its discretion

> determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

In the first circumstance, involving the use of a writing by a witness while testifying, the rule is unambiguous that the adverse party is entitled to obtain the writing at the hearing. Clearly in this opposition proceeding now before the Board the witness was using written notes while testifying at trial. To whatever extent opposer is claiming attorney-client privilege, the use of the notes by a witness while testifying generally results in a waiver of that privilege. See Ehrlich v. Howe, 29 FRServ3d 865, 848 F. Supp. 482 (SDNY 1994). To the extent opposer is claiming the work-product privilege, the "'potential for conflict [that] exists between Rule 612, which favors disclosure of materials used to refresh a witness' recollection, and the work-product privilege' is resolved by the courts on a case-by-case basis balancing 'the competing interests in the need for full disclosure and the need to protect the integrity of the adversary system protected by the work-product rule.'" Ehrlich v. Howe, supra, quoting from In re Joint Eastern and Southern District Asbestos Litigation, 119 FRD 4 (EDNY and SDNY 1988). An attorney's work product may be discovered only

11

upon a showing by the party seeking same that it has a "substantial need" of the materials in preparing its case and that it is unable to obtain the substantial equivalent of the materials by other means.  See Hickman v. Taylor, 329 U.S. 495 (1947).

As noted earlier, in this opposition, applicant was not seeking the notes used by a witness during a discovery deposition, but notes used at a trial-stage deposition. This is a key distinction.  The requirement that a party seeking a writing used by a witness -- when that writing would otherwise be protected work product -- show a "substantial need" therefor, applies in discovery.  It is not at all clear that applicant should be required to show a "substantial need" when opposer's witness used the writing during a testimony deposition.  While a discovery deposition ultimately may or may not be introduced into the record in a Board proceeding, each trial testimony deposition must be introduced pursuant to Trademark Rule 2.123(h).  Thus, it is not only applicant which has an interest in seeing the writing serving as the basis for at least part, if not all, of the witness's testimony; but the Board has an interest in seeing the document so that it can assess how much of the testimony is based on the witness's own recollection and how much is based on the writing.  Otherwise, the Board would be

unable to adequately assess the probative value of the testimony.

Even if the "substantial need" test applied, applicant had a substantial need for the notes used at the testimony deposition of the witness being deposed, and we particularly note that applicant's attorney was attending the deposition by way of telephone, and could not directly observe when the witness was reading prepared answers. We find that Fed. R. Evid. 612 requires that the notes be provided to applicant in the circumstances of this proceeding, even if they were work-product or protected by attorney-client privilege. As the Rule 612 "Advisory Committee Notes 1972 Proposed Rules" state, "The purpose of the rule is ... to promote the search of credibility and memory."

Applicant's objection to the direct examination portion of the testimony of Jason Dasal is sustained. Accordingly, the direct examination portion of Mr. Dasal's testimony is excluded from consideration and the exhibits introduced therein (except as explained in footnote 10) are excluded from consideration.[10] See Steiger Tractor, Inc. v. Steiner

---

[10] The Board notes that Exhibit Nos. 1 (a brochure from opposer titled "J&M Unmistakably Johnston & Murphy"), 2 (a photocopy of opposer's Registration No. 124,004), and 10 (a "Johnston & Murphy Spring I 2000" mail order catalog) were referred to in the cross-examination of the witness; and Exhibit Nos. 17 (a photocopy of three pages from a "collectors edition" of "100 Years of Footwear" from FN Century, and 20 (a photograph of a belt with a hang tag showing "J&M" in Roman script) were referred to in the redirect examination of the witness. These five exhibits and the

Corporation, 221 USPQ 165, 169-170 (TTAB 1984), reconsideration granted on grounds unrelated to Rule 612, 3 USPQ2d 1708 (TTAB 1987).

For clarity of the record, we shall now explain the admissibility of the other materials offered into the record by both parties under their respective notices of reliance.

Opposer's notice of reliance includes status and title copies of the four pleaded registrations in the notice of opposition, as well as the following three unpleaded registrations: Registration No. 1,245,893[11] for the mark UNMISTAKABLY J&M; Registration No. 604,265[12] for the mark shown below;

JOHNSTON J&M MURPHY

and Registration No. 1,189,395[13] for the mark shown below.

---

cross and redirect examination elicited in relation thereto are in the record.

[11] Issued on July 19, 1983 for "men's shoes" in International Class 25 with claimed first use in 1973, Section 8 affidavit accepted, Section 15 affidavit acknowledged.

[12] Issued on April 5, 1955 for "leather boots and shoes" in International Class 25 with claimed first use in 1911, Section 8 affidavit accepted, Section 15 affidavit acknowledged, twice renewed. The registration issued under Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f), as to "JOHNSTON" and "MURPHY."

[13] Issued on February 9, 1992 for "men's shoes" in International Class 25 with claimed first use on September 25, 1979, Section 8 affidavit accepted, Section 15 affidavit acknowledged. The word "collection" is disclaimed. This registration was cancelled under Section 8(a)(3) of the Trademark Act, 15 U.S.C. §1058(a)(3) and expired under Section 9, 15 U.S.C. §1059, in November 2002.



Applicant made no objection to opposer's reliance on the three unpleaded registrations, and in fact applicant treated the additional registrations as if they were of record. (See, e.g., applicant's brief, p. 1.) While opposer did not move to further amend its pleading, we consider opposer's pleading amended to conform to the evidence under Fed. R. Civ. P. 15(b).

The status and title copies of all seven registrations submitted under the notice of reliance were prepared by the USPTO in October 2001. For some of the registrations, however, Section 9 renewals were due subsequent to the preparation of the status and title copies.

When a registration owned by a party has been properly made of record in an inter partes case, and there are changes in the status of the registration between the time it was made of record and the time the case is decided, the Board will take judicial notice of, and rely upon, the current status of the registration as shown by the records of the USPTO. See TBMP §703.02(a), at page 700-10, and the cases cited therein.

The Board hereby takes judicial notice of the current status of opposer's involved registrations, and specifically

15

that Section 8(a)(3) affidavits and Section 9 renewal applications for Registration Nos. 1,721,290 and 1,734,916 were accepted by the Office. Registration No. 1,189,395, having been cancelled under Section 8 and having expired under Section 9 of the Trademark Act in 2002, will not be given further consideration.

The final item in opposer's notice of reliance refers to "documents produced by Applicant in response to Opposer's discovery requests...," consisting of four one-page documents showing applicant's advertisements which include his mark in a different form, namely, without the words "custom fiberglassing" and "waterproof." Opposer did not cite any Trademark Rule under which these were offered. Applicant did not object to these documents being entered in the record.

Trademark Rule 2.120(j)(3)(ii) provides that a party who has obtained from another party documents produced in response to document requests under Fed. R. Civ. P. 34 may not make the documents of record by way of notice of reliance, except to the extent they are admissible by notice of reliance under Trademark Rule 2.122(e) (printed publications and official records).[14]

---

[14] For the proper methods by which the documents produced by the adverse party in response to Fed. R. Civ. P. 34 document requests may be made of record, see TBMP §711.

Trademark Rule 2.120(j)(3)(i) provides, in relevant part, that an answer to an interrogatory may be offered into the record by filing a copy of the interrogatory and answer thereto with any exhibit made part of the answer, together with a notice of reliance thereon.[15]

Trademark Rule 2.122(e) provides, in relevant part, that printed publications, such as books and periodicals available to the general public or in general circulation among members of the public (or the relevant segment thereof) which is relevant to an issue in the proceeding, may be introduced through a notice of reliance. A notice of reliance offered under this rule must specify the publication (i.e., source and date), indicate the general relevance, and include a copy of the printed publication or relevant portion thereof.

As explained previously, opposer did not offer these documents pursuant to any specific Trademark Rule. If they were responses to document requests, they are not admissible under a notice of reliance. If they were produced by applicant as part of his answer to an interrogatory, they could be admissible, but here opposer provided neither any involved interrogatory nor applicant's answer thereto. If

---

[15] If documents are offered in response to an interrogatory, they are admissible under Trademark Rule 2.120(j)(3)(i). See e.g., Miles Laboratories Inc. v. Naturally Vitamin Supplements Inc., 1 USPQ2d 1445, footnote 9 (TTAB 1986, amended 1987).

these documents were offered under Trademark Rule 2.122(e) as printed publications, the source and date are not provided on any of the four documents, and, in addition, opposer did not state the general relevance of the documents.

However, upon review of these four documents, despite the lack of information as to source and date, it is clear that each one is a photocopy of a page from some printed periodical. Hence we will construe this portion of opposer's notice of reliance as being offered under Trademark Rule 2.122(e). Applicant has not objected to this material, and on the contrary has treated it as if of record (see e.g., applicant's brief, pp. 3-4.) Therefore, we will deem these documents to be stipulated into the record for whatever probative value they may have. However, because of the lack of information as to when and where they were published, such probative value is necessarily limited. See JSB International, Inc. v. Auto Sound North, Inc., 215 USPQ 60, footnote 3 (TTAB 1982).

Based on the above rulings by the Board, the record in this opposition proceeding consists of the pleadings; the file of the opposed application; the cross-examination and redirect examination portions of the testimony of Jason Dasal, director of retail marketing for Johnston & Murphy, a division of Genesco Inc.; status and title copies of six of

18

opposer's registrations; the four one-page advertisement documents produced by applicant; the testimony, with exhibits, of Gregory Martz; the status and title copy of applicant's registration; and applicant's first set of interrogatories and opposer's responses thereto.[16]

**Burden of Proof**

Opposer, as plaintiff in the opposition proceeding, bears the burden of proving, by a preponderance of the evidence, its asserted grounds of (i) priority and likelihood of confusion and (ii) dilution.  See Cerveceria Centroamericana, S.A. v. Cerveceria India Inc., 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989); and Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000).

**The Parties**

Opposer[17] sells "footwear and apparel and related goods" and operates "retail stores selling such goods throughout the United States" and has been doing so "for over a century."  More specifically, opposer uses its "J&M Marks" on "men's and unisex footwear, apparel, leather

---

[16] Opposer's responses to applicant's interrogatories were signed by one of opposer's attorneys, with a blank (unsigned and undated) "verification" page for the signature of Jason Dasal.
[17] In light of our ruling excluding the direct examination of opposer's witness, Jason Dasal, the evidence regarding opposer is found in the cross-examination and redirect examination of opposer's witness, and in opposer's answers to interrogatories made of record by applicant.

goods, fashion accessories and related goods and in connection with over 100 JOHNSTON & MURPHY retail stores located in major shopping malls throughout the United States." Opposer's products are also sold under its "J&M Marks" "through over 30 factory outlet stores, over 3000 better department stores and specialty retail stores, located principally in major shopping malls, and directly to consumers through retail mail order catalogs and [opposer's] website." (Opposer's responses to applicant's interrogatory Nos. 1 and 7.)

In the cross-examination of opposer's witness, Mr. Dasal testified that he has been employed by opposer for five and one-half years; that opposer has made a concerted effort in that time to push the "lifestyle nature of Johnston & Murphy and having items that relate both to the work part of our target customers' lives and the casual part—or leisure part of our customers' lives" (Dasal dep. on cross examination, p. 43); that sandals and beach-related items have been sold by opposer since he has worked there; that opposer has not used a fingerprint in connection with its J&M logo; that the J&M logo is never used without the ampersand and the "J" is always capitalized; that with regard to the J&M in an oval logo, opposer uses the oval in a horizontal orientation and has not used it in a vertical orientation; that opposer has not used the word "fiberglass"

20

(or "fiberglassing") in connection with its "J&M Marks"; and that the word "waterproof," when used by opposer with regard to items such as waterproof shoes and jackets, appears on a hang tag attached to the actual product.

Opposer is not aware of any instances of actual confusion. (Opposer's response to applicant's interrogatory No. 12, and Dasal dep. on cross-examination, p. 44.)

Applicant, Gregory Martz, has been in the surfboard fiberglassing business for 40 years. He is the sole owner of The Waterman's Guild, a company which opened in June 1983 and manufactures surfboards using the "'gm,' 'custom fiberglassing,' 'waterproof,' and thumbprint design" mark (as shown in applicant's Registration No. 2,379,130). His company makes about 80 – 100 surfboards a week under this mark. The sale of t-shirts carrying the same mark also commenced in June 1983. The mark has been continuously used on clothing since June 1, 1983. (Martz dep., p. 10.)

The mark developed over time because purchasers of applicant's surfboards had asked him to sign the product, and the signature ultimately evolved into his handwritten initials and his thumbprint stamped on the surfboard and printed on t-shirts. Since 1983 the logo has included the words "custom fiberglassing" and "waterproof." The letters "gm" always appear in lower case and the thumbprint is always oriented vertically. At the time Mr. Martz created

21

this mark, he had never heard of opposer's marks, JOHNSTON & MURPHY and/or J&M.

At one time applicant advertised his goods in <u>Surfing</u>, one of the few major magazines for the sport of surfing, but around 1991 he discontinued purchasing advertising because he had all the business he could handle. Applicant's goods have been featured in articles in magazines; and they have been used by professional surfers appearing in movies (e.g., Mark Occilupo in "North Shore").

Applicant's products are sold throughout the coastal United States, as well as around the world (Japan being one country with many customers for applicant's goods). Applicant's t-shirts sell at retail for about $15 - $17.95 each, and he sells about 36 dozen a year under the involved mark.

Mr. Martz testified that he was aware that surfing brands can become popular with mainstream consumers, such as Ocean Pacific, and in fact, that was what he had in mind with the involved mark.

Applicant is aware of no instances of actual confusion by consumers involving his mark and opposer's various "J&M Marks."

**Standing**

Opposer's standing is established by the status and title copies of its pleaded registrations. See Cunningham v. Laser Golf Corp., supra.

**Priority**

With regard to the issue of priority, because opposer owns valid and subsisting registrations of its pleaded "J&M Marks," the issue of priority does not arise. See King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974); and Carl Karcher Enterprises, Inc. v. Stars Restaurants Corp., 35 USPQ2d 1125 (TTAB 1995). Moreover, opposer's use of the mark J&M since 1892 precedes applicant's use of his involved mark since 1983.

**Likelihood of Confusion**

Our determination of likelihood of confusion is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). We have considered all of the factors that are relevant to determining this issue, but we have limited our discussion to those factors discussed by the parties in their briefs because they obviously viewed those factors as the most relevant in making the determination of likelihood of confusion. Based

on the record before us in this case, we find that confusion is not likely.

Turning first to a consideration of the parties' respective goods and services, applicant did not contest the similarity and relatedness of the parties' respective goods and services. In his brief on the case, applicant argued that "[I]t makes no difference that Martz and the Opposer may use their respective marks on the same or similar goods in the same channels of commerce. The marks are so different that they can be put on the same goods and sold in the same channels of commerce and there will be no likelihood of confusion." (Brief, p. 3.)

We agree that applicant's goods as identified are the same as or related to opposer's identified goods and services. We specifically find that applicant's various clothing items and opposer's various clothing items are in part identical (i.e., "socks" and "hosiery") and are otherwise related (e.g., applicant's jackets, pants and T-shirts and opposer's shoes and belts). See Kangol Ltd. v. KangaROOS U.S.A. Inc., 974 F.2d 161, 23 USPQ2d 1945 (Fed. Cir. 1992); In re Melville Corp., 18 USPQ2d 1386 (TTAB 1991); and In re Apparel Ventures, Inc., 229 USPQ 225 (TTAB 1986). We also find that applicant's identified clothing items are commercially related to opposer's services of retail and mail order sales of various clothing items. See

24

In re Hyper Shoppes (Ohio) Inc., 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir. 1988); Safety-Klean Corporation v. Dresser Industries, Inc., 518 F.2d 1399, 186 USPQ 476 (CCPA 1975); and Steelcase Inc. v. Steelcare Inc., 219 USPQ 433 (TTAB 1983).

Given the in-part identical and in-part related nature of the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade. See Canadian Imperial Bank of Commerce, National Association v. Wells Fargo Bank, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987); In re Smith and Mehaffey, 31 USPQ2d 1531 (TTAB 1994); and In re Elbaum, 211 USPQ 639 (TTAB 1981).

Turning to a consideration of the marks, opposer argues that the most prominent and significant feature of applicant's mark is the letters "gm"; that these letters could easily be read as "JM"; that applicant's mark and opposer's "J&M Marks" are closely similar in appearance; and that the dominant feature of both parties' marks ("gm" and "J&M") are nearly identical and create similar commercial impressions.

Applicant contends that the only common denominator in the parties' respective marks is the letter "M"; that a "g"

25

is not a "J"; that applicant's initials handwritten in lower case as "gm" are not at all similar to the letters and ampersand symbol used by opposer, "J&M" in any of opposer's font types and with or without the additional words and designs; that the thumbprint is a significant feature of applicant's mark and cannot be ignored as only background; and that the parties' various design portions of their marks are quite distinguishable.

In In re Electrolyte Laboratories Inc., 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990), another case involving composite marks featuring letters, the Court of Appeals for the Federal Circuit made the following statement:

> There is no general rule as to whether letters or design will dominate in composite marks; nor is the dominance of letters or design dispositive of the issue. No element of a mark is ignored simply because it is less dominant, or would not have trademark significance if used alone. ...
>
> ...[T]he spoken or vocalizable element of a design mark, taken without the design, need not of itself serve to distinguish the goods. The nature of stylized letter marks is that they partake of both visual and oral indicia, and both must be weighed in the context in which they occur.
>
> ...[E]ven if the letter portion of a design mark could be vocalized, that was not dispositive of whether there would be likelihood of confusion. A design is viewed, not spoken, and a stylized

> letter design can not be treated simply
> as a word mark.

As stated by McCarthy at 3 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, §23:33 (4th ed. 2001):

> For similar design or letter marks,
> similarity of appearance is usually
> controlling, for such marks are
> incapable of being pronounced or of
> conveying any inherent meaning, as do
> word marks.  For such marks, the
> lettering style may be sufficient to
> prevent a likelihood of confusion.
> (Footnote omitted)

Moreover, it is well settled that marks must be considered in their entireties, not dissected or split into component parts and each part compared with other parts. This is so because it is the entire mark which is perceived by the purchasing public, and therefore, it is the entire mark that must be compared to any other mark.  It is the impression created by the involved marks, each considered as a whole, that is important.  See Kangol Ltd. v. KangaROOS U.S.A. Inc., supra; and Franklin Mint Corporation v. Master Manufacturing Company, 667 F.2d 1005, 212 USPQ 233 (CCPA 1981).  See also, 3 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, §23:41 (4th ed. 2001).

In this case, applicant's mark consists of the lower case handwritten letters "gm," the words "custom fiberglassing" and "waterproof" and a prominent thumbprint design, whereas each of opposer's registered marks consists of or includes two letters and an ampersand symbol "J&M,"

and some of opposer's marks show the "J&M" in stylized lettering, one even includes the surnames "JOHNSTON & MURPHY" for which the initials J&M stand. Thus, these marks generally are hybrid marks, combining letters, symbols, designs and words in various combinations. In the JOHNSTON & MURPHY mark, the words dominate. In opposer's marks that show "J&M" in script or Roman font, this typescript is quite distinguishable from the handwritten letters "gm" in applicant's mark. In any case, in all of opposer's marks the letters would clearly be viewed as "J & M," with an ampersand between the letters, while in applicant's mark the letters are "gm" and there is obviously no ampersand. Further, the thumbprint design is a strong visual feature of applicant's mark which is another difference from opposer's marks.

As to the connotations of the parties' marks, applicant's mark has the connotation of an individual providing, via thumbprint, some indication or sign of approval or authenticity; whereas opposer's marks have the connotation of a partnership of two individuals, particularly the mark including the words JOHNSTON & MURPHY.

Considering the marks in their entireties, we find that applicant's mark when considered in relation to each of opposer's six registered "J&M Marks," differs substantially in appearance, sound, connotation and commercial impression.

28

It is this factor which is pivotal in this case.  See Champagne Louis Roederer S.A. v. Delicato Vineyards, 148 F.3d 1373, 47 USPQ2d 1459 (Fed. Cir. 1998); and Kellogg Co. v. Pack'em Enterprises Inc., 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991).  That is, even considering the various du Pont factors which favor opposer, as discussed elsewhere in this opinion, this factor of the dissimilarities of the marks so outweighs the other factors that applicant must prevail on the issue of likelihood of confusion.

Another du Pont factor we consider in this case is the fame of opposer's marks.  Opposer contends that its marks are famous and entitled to a broad scope of protection.  The only information we have of record regarding this claim is from opposer's answers to interrogatories.  When asked to state all facts relating to opposer's claim of likelihood of confusion (interrogatory No. 1), opposer answered, in relevant part, as follows:

> "...[opposer's] J&M Marks have been used, advertised and promoted extensively in the field of footwear and apparel and related goods, and with retail stores selling such goods throughout the United States for over a century...."

When asked to describe the channels of distribution though which opposer's goods and services have been sold (interrogatory No. 7), opposer answered, in relevant part, as follows:

29

> "Opposer's J&M Marks is [sic-are] used
> in relation to men's and unisex
> footwear, apparel, leather goods,
> fashion accessories and related goods
> and in connection with over 100 JOHNSTON
> & MURPHY retail stores located in major
> shopping malls throughout the United
> States.  Opposer's products under the
> J&M Marks are also sold through over 30
> factory outlet stores, over 3000 better
> department stores and specialty retail
> stores...and directly to consumers
> through retail mail order catalogs and
> [opposer's] website."

The general and self-serving statement that opposer's marks have been used and advertised "extensively" is entitled to little weight in establishing the fame of opposer's marks.  There is no evidence of specific sales or advertising figures, nor has opposer provided evidence as to the length of use for the individual "J&M" marks.  Because in the interrogatory responses opposer refers to its marks together as "J&M Marks," we cannot determine whether or to what extent any specific J&M mark has achieved public recognition and renown.  We would also point out that two of opposer's marks are not for the letters J&M per se, but that one includes the words JOHNSTON & MURPHY and another begins with the word UNMISTAKABLY.

Even accepting that opposer's mark which was registered in 1918 (Registration No. 124,004 for J&M in script form) has been used for over a century, mere length of time that a mark is in use does not by itself establish consumer awareness of the mark, such that the mark can be found to be

30

famous.  See General Mills Inc. v. Health Valley Foods, 24 USPQ2d 1270, 1277 (TTAB 1992).  The limited evidence we have of long use of this mark and availability of opposer's goods to consumers through its own retail stores and outlets, and in department stores and specialty stores (with no indication as to how long the goods have been sold in such channels of trade), is not sufficient to establish public recognition and renown of any one, much less all of opposer's "J&M" marks, as that du Pont factor has been interpreted.  See The Sports Authority Michigan Inc. v. PC Authority Inc., supra; and Toro Co. v. ToroHead Inc., 61 USPQ2d 1164, 1170 (TTAB 2001).  Cf. Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).[18]  In particular, there is no information as to the amount of sales and expenditures for and types of advertising of goods under the "J&M Marks."  Simply put, there is no evidence in this record which establishes that opposer's various J&M marks, or any one of them, are famous and well known to the purchasing public.

---

[18] Opposer's direct examination (and exhibits) of its witness, Jason Dasal, have been excluded from the record.  Even if the direct examination portion of Mr. Dasal's testimony were admissible (which it is not) and accorded its full weight so as to provide additional evidence of renown, the evidence would be insufficient to establish fame.  Accordingly, we would still conclude that in considering and balancing all relevant du Pont factors in this case, the marks involved are simply so dissimilar that there is no likelihood of confusion.

Another du Pont factor to be considered in the case now before us is "the variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." Opposer has registered variations of its "J&M Marks" for shoes as well as other clothing items, and also for shoe products such as "shoe horns," "shoe polishes," "cedar shoe trees"; leather accessory goods such as "wallets," "travel bags," "card cases," "business card holders"; and "closet accessories namely cedar blocks..."; as well as for retail stores. While this factor may favor a finding that confusion is likely even if the goods are not obviously related, the parties' goods in issue, as stated previously, are in-part identical and in-part related. Thus, this factor, as well as the relatedness of the goods, would favor opposer. See Uncle Ben's Inc. v. Stubenberg International Inc., 47 USPQ2d 1310 (TTAB 1998).

Finally, we turn to the du Pont factor relating to actual confusion. Despite simultaneous use since 1983, there have been no reported instances of actual confusion. Although evidence of actual confusion is admittedly difficult to obtain, twenty years of contemporaneous use is a significant amount of time. We find that this factor is neutral or weighs in applicant's favor.

Viewing the evidence in its entirety, we find the single du Pont factor of the dissimilarities of the marks

32

overwhelms the other factors.  Champagne Louis Roederer S.A. v. Delicato Vineyards, supra; and Kellogg Co. v. Pack'em Enterprises Inc., supra.  The contemporaneous use of these marks, as has occurred since 1983, in connection with the respective goods and services, is not likely to cause confusion as to the source or sponsorship of such goods and services.  See Burns Philip Food Inc. v. Modern Products Inc., 24 USPQ2d 1157 (TTAB 1992), aff'd, unpub'd, but appearing at 1 F.3d 1252, 28 USPQ2d 1687 (Fed. Cir. 1993).

**Dilution**

Inasmuch as opposer has not established that its "J&M Marks" are renowned under the du Pont factors for purposes of its likelihood of confusion claim, it is clear that opposer likewise has not established that its "J&M Marks" are famous under Section 43(c) for purposes of its dilution claim.  Opposer cannot prevail on its pleaded ground of dilution.  See Section 43(c) of the Trademark Act; and Toro Co. v. ToroHead Inc., supra.

**Decision**:  The opposition is dismissed.